## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>                                    **Plaintiff,**<br>     v.<br><br>**BRADLEY J. MOYNES,**<br>**DIGATRADE FINANCIAL CORP.,**<br>                                    **Defendants,**<br>**and**<br><br>**VANCAP VENTURES, INC.,**<br>                                    **Relief Defendant,** | **Civil Action No. 22-CV-____  (___)**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the following against Defendants Bradley J. Moynes ("Moynes") and Digatrade Financial Corp. ("Digatrade") and Relief Defendant Vancap Ventures, Inc. ("Vancap Ventures"):

## SUMMARY

1.      This is a securities fraud enforcement action.  For at least four years, from March 2014 through September 2018 (the "Relevant Period"), Moynes orchestrated a scheme to defraud retail investors in United States securities markets by secretly selling the stock of two small and thinly-traded companies, Formcap Corporation ("Formcap") and Digatrade while he was the President and a director of those companies.  Moynes served as the President, Director, Chief Executive Officer, Chairman, and Chief Financial Officer of Digatrade, and as such was the company's pubic face and responsible for all major corporate decisions.

2.      Moynes secretly held the stock of Formcap and Digatrade by using foreign nominee companies to act as shareholders while he retained ownership and control of the stock.

He then directed sales of Formcap's and Digatrade's stock into the market.  Moynes violated the U.S. securities laws because he did not register his sales of the stock with the Commission and did not disclose accurate information about his control over the stock he was selling.  As a result of Moynes' deceptive conduct, investors buying the stock he sold were deprived of important information – that the stock they purchased was being dumped by the president and majority shareholder of the companies.  Moynes' fraudulent scheme generated over $6 million with Defendants receiving over $1.5 million in illicit proceeds.

3.      While secretly selling his stock of Formcap and Digatrade, Moynes, as the President of Digatrade and Formcap, strategically issued press releases discussing each company's business prospects but he did not disclose that he was selling and would continue to sell his stock.  In addition, with respect to Digatrade, he also paid for promotions that encouraged investors to buy Digatrade stock while secretly selling his stock in Digatrade.

4.      Moynes continued his scheme through at least 2018.   Each time that he depleted his holdings of Digatrade stock that he secretly held through nominee companies, Moynes caused Digatrade to issue new stock and distributed that stock to the nominee companies.  He then worked with others to direct the sale of those new shares during promotional campaigns – thus generating additional illicit proceeds.

**Moynes and Digatrade Violated the Securities Laws**

5.      As a result of the conduct alleged herein, Moynes and Digatrade violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder.

6.      The Commission seeks: permanent injunctions against the Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this

Complaint; disgorgement jointly and severally of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest pursuant to Section 21(d) of the Exchange Act; civil penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act; an order barring Defendants from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act and/or Section 21(d) of the Exchange Act; and such other relief as the Court may deem appropriate.  Further, as to Moynes, the Commission seeks a conduct-based injunction enjoining him from directly or indirectly, including but not limited to, through an entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent him from purchasing or selling securities listed on a national securities exchange for his own personal account; and an officer and director bar pursuant to Section 20(e) of the Securities Act and Section 21(d) of the Exchange Act.

7.      The Commission also seeks relief against Vancap Ventures, the Relief Defendant, which received proceeds of the Defendants' unlawful acts, practices and schemes and should not be entitled to retain those illegally-derived proceeds.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), 78aa].

9.      Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa.  Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the District of Massachusetts, and were effected, directly or indirectly, by making use of means or

instrumentalities of transportation or communication in interstate commerce, or the mails. For example, during the Relevant Period, certain individuals who reside in the District of Massachusetts purchased the stock of Digatrade and/or Formcap.

## DEFENDANTS

10.     Bradley J. Moynes, age 51, is a Canadian citizen and a resident of British Columbia, Canada. From 1997 through 2000, Moynes was an investment adviser in Canada. He has been the President of Digatrade since 2000. He also served as Chief Executive Officer and Chief Financial Officer of Digatrade since 2016 and as Chairman since 2017.

11.     Digatrade Financial Corp. is a Canadian corporation headquartered in Vancouver, British Columbia, Canada. Since 2000, Digatrade has had several name changes and changed business plans several times. It currently purports to operate as an internet financial services company. Digatrade has no employees other than Moynes. On July 21, 2006, then known as Black Diamond Holdings Corporation, Digatrade filed with the Commission a Form 20-FR to register a class of securities pursuant to Section 12(g) of the Exchange Act. That registration remains in effect. Digatrade's securities are quoted on OTC Link, operated by OTC Markets, Group Inc., and during the Relevant Period traded under the following symbols: "RCFEF" (November 2008 - February 2015), "BITXF" (February 2015 – October 2015), and "DIGAF" (October 2015 to present). Digatrade files periodic reports with the Commission pursuant to Section 13(a) of the Exchange Act and the rules thereunder. In this Complaint, "Digatrade" refers to Digatrade Financial Corp. and any of its predecessor entities.

## RELIEF DEFENDANT

12.     Vancap Ventures Inc. is a Canadian company incorporated in November 2010 and solely owned by Moynes. Moynes transferred, directly or indirectly, approximately $1 million

4

derived from his illicit stock sales to a bank account in the name of Vancap Ventures.

## RELATED ENTITY AND OTHER INDIVIDUAL

13.     Formcap Corp. is a Nevada corporation and, during the Relevant Period, purported to be in the business of oil and gas exploration and development.  During the Relevant Period, Formcap's common stock was registered with the Commission under Section 12(g) of the Exchange Act, and its securities were quoted on OTC Link, operated by OTC Markets Group Inc., under the symbol "FRMC."  From June 2014 through June 2015, Moynes was the President and Director of Formcap.  Formcap shares are no longer publicly quoted on OTC Link.

14.     Luis Jimenez Carrillo, age 48, is a citizen and resident of Mexico.  He was formerly licensed to practice law in California and New Jersey.  Carrillo remains licensed to practice law in New York.  In 2013, the Commission filed an action against Carrillo for his role as a securities attorney facilitating a pump and dump scheme involving penny stocks.  A judgment in that case was entered against Carrillo after his default.  *See SEC v. Carrillo Huettel LLP, et al.*, Civil Action No. 13-cv-1735 (S.D.N.Y.).  In August 2021, the Commission charged Carrillo for his conduct associated with numerous microcap schemes.  *See SEC v. Carrillo, et al.*, Civil Action No. 21-cv-11272 (D. Mass.).  That case remains pending as to Carrillo.

## BACKGROUND AND DEFINITIONS

15.     Before selling stock, persons who control the stock of public companies ("control persons") are required to: (a) register such sales with the Commission pursuant to Section 5 of the Securities Act [15 U.S.C. §77e]; (b) sell the stock pursuant to an applicable exemption from registration; or (c) sell the stock pursuant to conditions set forth in SEC Rule 144 [17 C.F.R. §240.144], including limitations on the amount of stock a control person can legally sell.  In addition, for public companies whose securities are registered under Section 12 of the Exchange

Act, investors owning 5% or more of such company's stock are required publicly to disclose their ownership interest, while investors owning 10% or more of such company's stock are required publicly to disclose all of their trading in that stock, regardless of quantity.  Such registration requirements, sale restrictions, and disclosure obligations are safeguards designed to protect the market for purchases and sales of stock, to inform investors about the nature of the stock they are holding or considering buying, and from whom they would be buying that stock.

16.     An "affiliate" of an issuer is a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer (i.e., a control person).  "Control" means the power to direct management and policies of the company in question.  Typically, affiliates include officers, directors and controlling shareholders, but any person who is under "common control" with or has common control of an issuer is also an affiliate.

17.     The Over-the-Counter ("OTC") Markets is a stock quotation service based in New York that facilitates public trading of shares in public companies that are not otherwise listed on national securities exchanges (like NASDAQ or the New York Stock Exchange).  Public companies that do not have an obligation to file reports with the Commission may, nonetheless, choose to file public reports (such as quarterly and annual statements) on the OTC Markets website for investors to review and consider when making investment decisions.

18.     "Penny Stock," as used herein, generally refers to a security issued by a very small company whose stock trades at less than $5 per share.  During the Relevant Period, both Formcap and Digatrade were penny stocks.

19.     "Restricted stock" includes stock of a publicly traded company (also known as an "issuer") that has been acquired from an issuer, or an affiliate of an issuer, in a private

transaction that is not registered with the Commission.  In addition, stock held by an issuer or

affiliate of an issuer is restricted stock.  Absent an exemption under the federal securities laws

and rules, restricted stock cannot legally be offered or sold to the public unless a securities

registration statement has been filed with the Commission (for an offer) or is in effect (for a

sale).  A registration statement contains important information about an issuer's business

operations, financial condition, results of operation, risk factors, and management.  It also

identifies any person or group who is the beneficial owner of more than 5% of the company's

securities.

20.    "Unrestricted stock" is stock that may legally be offered and sold in the public

securities marketplace by a non-affiliate of an issuer, ordinarily having previously been subject

to a registration statement.  Registration statements are transaction specific, and apply to each

separate offer and sale as detailed in the registration statement.  Registration, therefore, does not

attach to the security itself, and registration at one stage for one party does not necessarily suffice

to register subsequent offers and sales by the same or different parties.  When a control person

buys publicly traded or otherwise unrestricted shares in a company that s/he controls, those

shares automatically become subject to the legal restrictions on sales by an affiliate. Such legal

restrictions include strict limits on the quantity of shares that may be sold in the public markets

absent registration. Without registration, affiliates are prohibited from selling large quantities of

an issuer's shares, regardless of how the affiliates obtained those shares.

21.    "Float" is the amount of unrestricted shares on deposit with broker-dealers and

available for trading in the public market.

22.    A "transfer agent" is a company which, among other things, issues and cancels

certificates of a company's stock to reflect changes in ownership.  Many companies that have

publicly traded securities use transfer agents to keep track of the individuals and entities that own their stock.  Transfer agents routinely keep track of whether shares are restricted from resale.

### The Sharp Group

23.     Moynes utilized the illicit services of Frederick L. Sharp and his employees ("the Sharp Group") to facilitate each step of his fraud.  Some Sharp Group operators were sued by the Commission for violating the securities laws.  *See SEC v. Sharp, et. al.*, No. 1:21-cv-11276-WGY (D. Mass. filed Aug. 5, 2021).  Sharp and one of his employees were also charged criminally by the United States Department of Justice.  *See U.S. v. Sharp, et. al.*, 1:21-mj-07182-JCB (D. Mass filed Aug. 4, 2021).

24.     From at least 2010 to 2019, the Sharp Group was in the business of facilitating illegal stock sales in the public securities markets.  The Sharp Group provided a variety of services to help its clients (including Moynes), who were public company control persons, conceal their identities when selling the stock of companies they controlled.  By utilizing the Sharp Group's services to disguise his identity and his controlling positions, Moynes fraudulently concealed the fact that he, the president of two public companies, was selling large blocks of each company's stock to unsuspecting investors.

25.     The Sharp Group deliberately concealed the identities of its clients through the array of services it offered, including: forming and providing overseas nominee companies that held shares for undisclosed control persons; arranging for clients to deposit stock in overseas trading platforms to obfuscate the control persons' association with their public company penny stock; and providing and administering an encrypted communication network by purchasing, configuring and delivering devices which the Sharp Group referred to as "xPhones."  The xPhones could only be used for communications on the Sharp Group's encrypted

communications network, and xPhone users communicated using code-names and numbers.  As detailed below, Moynes utilized all the foregoing Sharp Group services in carrying out his fraudulent scheme.  Moynes' code number for xPhone messages was "126."

26.     The Sharp Group also provided additional services to its clients to further the clients' fraudulent schemes such as: administering a proprietary accounting system, referred to as "Q," that tracked a client's total stock holdings and sales across various nominee shareholders and trading platforms; paying out the proceeds of illegal stock sales at clients' direction to accounts around the world and/or to clients' internal accounts with the Sharp Group; arranging to route such payments by circuitous methods designed to conceal the source of funds; and fabricating documents, such as invoices, to conceal the nature and source of the payments. Moynes also utilized these additional Sharp Group services in carrying out his fraudulent scheme.

## MOYNES' FORMCAP FRAUD

27.     In March 2014, Moynes became a Sharp Group client.  In May 2013, ten months before Moynes became an official client of the Sharp Group, Q accounting records show that the Sharp Group controlled 95% of Formcap's purportedly unrestricted shares.

28.     The Sharp Group strategically split its Formcap shares into blocks of stock of less than 5% of the total outstanding Formcap stock.  The Sharp Group then distributed each block to a different Sharp Group nominee company and deposited the shares in the overseas brokerage accounts of those nominees.  The Sharp Group broke the shares into blocks of less than 5% ownership to avoid reporting requirements and restrictions, and scrutiny by brokerage firms and other market participants like transfer agents.

29.     After becoming a Sharp Group client, Moynes took control of 20 million Formcap shares deposited with the Sharp Group's nominee companies.  At that time, Moynes controlled approximately 19.5% of Formcap's total shares outstanding.  Moynes then began his scheme.

30.     Moynes immediately began using his newly issued xPhone to direct trading in Formcap stock.  Moynes communicated trading instructions to the Sharp Group traders using encrypted xPhone messages.  The Sharp Group traders arranged with overseas brokerage firms to sell the Formcap stock Moynes controlled.  From March 2014 through July 2014, Moynes directed the sale of approximately 9.9 million shares of Formcap held by the Sharp Group's nominee companies.

31.     In June 2014, Moynes became the President and a director of Formcap.  Two weeks later, Moynes continued to demonstrate his control over the Sharp-Group nominee companies when he directed Sharp (via an encrypted xPhone message) to have one of the nominee companies sign a consent for a proposed corporate action.  Moynes wrote, "Need one of the Companys [sic] who is still holding a block of FRMC [Formcap] (4,422,222). Need a consent form signed..."

32.     The next month, at Moynes' direction, Formcap stock underwent a reverse split, which exchanged 10 existing shares of Formcap for one new share, thus reducing the total number of outstanding share of Formcap. Moynes then directed the Sharp Group traders to sell another 1,364,246 shares of Formcap for him (the equivalent of 13,642,460 pre-split shares). During the time he was selling shares of Formcap, Moynes issued press releases touting Formcap's business prospects; none of those press releases or any other public filing disclosed that Moynes, the President of Formcap, was selling -- and would continue to sell -- his shares of Formcap.  Between March 2014 and November 2014, Moynes dumped millions of shares of

Formcap stock via Sharp Group nominee companies into the public market, generating trading proceeds of $327,745.

33.     Moynes directly benefited from the sales of Formcap stock through the Sharp Group in the amount of approximately $256,000.  At Moynes' direction, the Sharp Group wired these net profits in six payments to the bank account of Vancap Ventures.  Vancap Ventures was a Canadian company owned by Moynes.

34.     The Exchange Act requires individuals who acquire more than 5% of the outstanding stock of companies registered under Section 12 of the Exchange Act to file reports with the Commission that disclose their ownership interest.  These ownership reports provide important information to investors about what a company's control persons are doing with their stock.  Formcap was a company registered under Section 12.  Moynes controlled more than 5% of Formcap's stock.  Moynes never reported his beneficial ownership of the Formcap shares he held through the Sharp Group and never reported his sale of those shares as required under securities laws.

35.     Moynes was formerly an investment adviser and was aware of the securities laws. He was also an officer and director of two publicly traded companies.  Moynes knew about and understood, or recklessly disregarded, Section 13(d) of the Exchange Act, which required that Moynes disclose his direct or indirect ownership, of more than 5% of Formcap's outstanding shares.  Moynes controlled the Sharp Group nominee companies, and as a result, he was the beneficial owner of more than 5% of Formcap's publicly traded stock and was required to disclose that interest.

36.     At the time that Moynes directly or indirectly sold Formcap stock, there was no registration statement for those sales on file with the Commission or in effect as to those

transactions, as required by Section 5 of the Securities Act.  Moynes also failed to comply with the sale limitations of SEC Rule 144 when directly or indirectly selling Formcap stock.  Those sales were made using the interstate telecommunications facilities of OTC Markets in the United States.

37.     Moynes knew or was reckless in not knowing, that he was required to register his sales of Formcap stock with the Commission or otherwise comply with the conditions of SEC Rule 144.  Alternatively, Moynes was negligent in failing to register his sales and otherwise complying with the conditions of SEC Rule 144.

**DEFENDANTS' DIGATRADE FRAUD**

38.     Moynes has been the President and Director of Digatrade since December of 2000.  He currently serves as the Chairman, CEO, President and CFO of Digatrade.  During that entire time period, Digatrade did not have any employees and Moynes was the only officer to receive a salary.  As of April 2014, Digatrade had approximately 52,417,000 outstanding shares, and Moynes personally controlled 95.8% of those outstanding shares.  As of April 2014, all of Moynes' shares were publicly reported and were restricted shares.

39.     In March 2014, Moynes directed a Sharp Group employee to provide him with the names of six nominee companies that he could use to hold shares of Digatrade.  In May of 2014, Moynes arranged for Digatrade to issue an additional 28 million purportedly free-trading shares. According to public filings, those shares were allegedly issued to settle old debts held by unrelated third parties.  Those third parties purportedly purchased the debts from creditors of Digatrade.  In reality, six of those supposed third parties were Sharp Group nominee companies that the Sharp Group made available to Moynes in March 2014, and Moynes secretly retained ownership and control over 21 million of the 28 million shares through those six nominees.

40.     Moynes sent a Sharp Group employee share certificates for each nominee company's new shares.  Each nominee's block of shares was less than 5% of Digatrade's total outstanding shares after including in that total the 28 million new shares issued in exchange for debt.  Breaking the shares into blocks of less than 5% ownership avoided scrutiny by brokerage firms and other market participants like transfer agents.  Beginning in June 2014, the Sharp Group began depositing Moynes' Digatrade stock into the Sharp-Group nominee companies' overseas brokerage accounts.  These purportedly unrestricted shares held by the nominee companies should have been restricted because Moynes retained control and ownership of those shares via the Sharp Group.

41.     In June 2014 encrypted xPhone messages with Sharp and a Sharp Group employee, Moynes demonstrated his knowledge of the 5% ownership reporting requirement. The Sharp Group employee questioned Moynes about the shareholder certificates that Moynes had provided, stating: "all over 5%."  Moynes corrected the employee, stating that there was a subsequent event where "28,000,000 [shares were issued] for debt settlement which 21,000,000 you have for deposit."  The Sharp Group employee wrote, "The brokers will want evidence its [sic] not over 5%," to which Sharp replied that the "Company needs to file news re debt settlement and new total issued shares."  Moynes responded that he would disseminate news within the hour.  That same day, Digatrade issued a press release about the issuance of 28,000,000 common shares for the settlement of debt and emphasized that Digatrade then had 80,417,179 outstanding common shares.  This press release confirmed that each of the six Sharp Group nominees held blocks of shares that were 4.4% of Digatrade's total outstanding shares, based on the revised total outstanding shares in this press release.

**Moynes Manipulated Digatrade's Stock Price and Trading Volume**

42.     Prior to selling his Digatrade shares, Moynes directed a Sharp Group trader to buy Digatrade stock on numerous occasions to support and inflate the price of the stock.  For example, in September 2014, Moynes began working with a Sharp Group trader to buy Digatrade stock to increase Digatrade's market capitalization.  Moynes was concerned that if Digatrade's market capitalization remained low, one of the offshore broker-dealers where one of the nominee company's Digatrade shares was deposited would not continue to allow the stock to remain deposited for prompt sale.  Moynes provided a series of trading instructions via encrypted xPhone messages to the Sharp Group trader towards the end of the trading day to buy at higher prices.  This practice is colloquially referred to as "marking the close" because it seeks to influence the stock's closing price for the day.

43.     For example, on September 22, 2014, Digatrade stock opened at $0.25 per share; it had not traded at all in over two weeks.  During that day, Moynes directed Sharp Group traders to purchase a total of 24,000 Digatrade shares, accounting for over 88% of the day's trading volume.  Moynes' trading had the effect of raising the price of the stock to an intraday high of $0.60 per share.  The stock closed at $0.57 per share – a 128% increase from the opening price.

44.     Moynes also engaged in manipulative trading to artificially support the price of Digatrade stock while he sold the stock.  For example, during early June 2015, Digatrade's stock price had a two-week continuous decline.  On the evening of June 18, Moynes wrote to Sharp and a Sharp Group trader in an encrypted xPhone message, "I would like to bid and maybe buy a little stock to help it out."  Then, on June 19, 2015, Moynes, through the Sharp Group trader, purchased 7,500 shares of Digatrade stock in one Sharp Group controlled account and on that

same day, Moynes directed the sale of 39,472 shares of Digatrade stock in another Sharp Group-controlled account.

45.     In May 2015, Moynes began selling Digatrade stock aggressively via the Sharp Group.  Moynes reached out by xPhone message to a Sharp Group trader and told him to be ready and available to sell stock.  Between May 2015 and April 2016, Moynes directed Digatrade trading through the Sharp Group traders.  At the same time, Moynes funded stock promotions of Digatrade in order to increase demand for the stock.  Moynes made payments to the various stock promoters through the Sharp Group, thereby concealing his role in each of those promotions.

46.     Between May 2015 and April 2016, Moynes continued selling his Digatrade stock through the Sharp Group.  During this period, Moynes sold approximately 3.5 million shares, generating approximately $533,000 in proceeds through the Sharp Group nominees' accounts.

**Moynes' Coordination with Sharp Group Associate, Carrillo**

47.     By mid-2016, Moynes' scheme moved to the next phase.  Carrillo, another client of the Sharp Group and a recidivist penny stock schemer, became involved in the Digatrade scheme.  Moynes, the Sharp Group employees, and Carrillo working with his own associates (collectively the "Digatrade Control Group") coordinated efforts to promote and direct trading in Digatrade stock.

48.     On July 23, 2016, Moynes caused Digatrade to undergo a 1-for-50 reverse stock split, reducing the previously outstanding shares and the "float" substantially.  This was an important step in Moynes' scheme, because it allowed Moynes to clean the slate by diluting the shares held by many of the investors who were victims of the first phase of Moynes' fraudulent selling of Digatrade shares.  The number of Digatrade shares Moynes held with the Sharp Group

decreased from 17,527,350 shares to 350,547 shares.

49.     Following the reverse split, in August 2016, Moynes caused Digatrade to issue 25,250,000 restricted shares, with 25,000,000 of those shares going to Moynes.  On the same day, Moynes caused Digatrade to issue 8,000,000 purportedly unrestricted shares in exchange for convertible debt.  Moynes signed board resolutions, debt settlement agreements, and issuer representation letters to effectuate this creation of new shares.  Over the next three months, all but 50,000 of the 8,000,000 newly-issued -- and purportedly unrestricted -- shares were transferred to the Sharp Group to be secretly held for the Digatrade Control Group.  Though these shares appeared to be unrestricted, they should have been restricted shares because they were controlled by the Digatrade Control Group, an affiliate of Digatrade.

50.     Once again, each Sharp Group nominee company held Digatrade shares in blocks of less than 5% of total outstanding shares of Digatrade to avoid disclosure requirements, as well as scrutiny by brokerage firms and other market participants like transfer agents.  The Digatrade Control Group then directed the Sharp Group to deposit the shares into various Sharp Group nominee companies' overseas brokerage accounts.  In fact, by the end of 2016, the Digatrade Control Group controlled approximately 97% of the cumulative deposit of all Digatrade shares deposited with brokers, i.e. the float.  In addition, Moynes continued to own over 25 million restricted shares in his own name.

51.     Various market participants including transfer agents were misled by the Digatrade Control Group's actions; the purportedly unrestricted shares held by Sharp Group nominee companies should have been restricted because the Digatrade Control Group retained control and ownership over those shares.

52.     Starting November 1, 2016, Carrillo orchestrated a promotional campaign to

promote Digatrade stock to investors by agreeing to pay the operators of a boiler room based in

Medellin, Colombia to call potential investors.  The operators of this boiler room have been

charged by the Commission with securities fraud.  *See SEC v. Biller, et al.*, No. 22-cv-1406

(E.D.N.Y. filed Mar. 14, 2022).  Boiler rooms are call centers that typically use high-pressure

sales tactics to encourage investors to buy securities, usually penny stocks like Digatrade.

Carrillo knew that the boiler room he hired would call investors and encourage them to buy

Digatrade stock without revealing that they were being paid by the person who owned most of

the Digatrade stock available for sale or that they stood to profit handsomely from the investors'

purchases.  At or about the same time of the promotional campaign, the Digatrade Control Group

directed the sales of Digatrade stock.  Before and during the time that Carrillo was promoting

Digatrade stock, Moynes issued Digatrade press releases, on behalf of the company, publicizing

new business ventures.

53.    The Digatrade Control Group's campaign was successful.  Over two days,

November 1 and 2, 2016, Sharp Group nominees' brokerage accounts controlled by the

Digatrade Control Group sold over 4.5 million shares of Digatrade (over 50% of the company's

float), generating approximately $2.3 million in proceeds.  Despite the heavy selling, the

promotion effort was successful as Digatrade's stock price rose from a closing price of $0.13 per

share on October 31, 2016 to a closing price of $0.59 per share on November 1, and peaked at

$0.96 per share on November 14, 2016, as reflected in the chart below:



By mid-December 2016, the Digatrade Control Group had sold all of the purportedly free-trading stock they held through the Sharp Group at a substantial profit.

54.     In December 2016, the Financial Industry Regulatory Authority ("FINRA"), which oversees U.S. broker-dealers, questioned Moynes about the dramatic increase in Digatrade's stock price and trading volume and the contemporaneous press releases that he released as President of Digatrade.  Moynes falsely told FINRA that he did not trade Digatrade stock and did not know anyone who was trading Digatrade stock.

55.     The next month, January 2017, Moynes needed more Digatrade shares to continue his scheme.  That month, Moynes caused Digatrade to issue another 8,000,000 purportedly free-trading shares to five Sharp Group nominee companies.  The shares were issued in exchange for purported debt.  Again, Moynes signed board resolutions, debt settlement agreements, and issuer representation letters to effectuate this issuance of new shares.  Each Sharp Group nominee company received a block of shares that was less than 5% of the then-outstanding total shares of

Digatrade, and thus the shares appeared to be unrestricted.  However, in reality, the Digatrade

Control Group retained ownership and control of these new Digatrade shares.

56.      Over the next several months, at the direction of the Digatrade Control Group, the

Sharp Group deposited all of the 8,000,000 purportedly unrestricted shares with brokerage firms

holding accounts for the Sharp Group nominees, and the Digatrade Control Group directed the

sale of all of the shares to generate substantial profits.  This pattern was repeated several times

through 2018.

57.      From September 2017 through September 2018, Moynes caused Digatrade to

issue millions of additional purportedly unrestricted shares for deposit with the Sharp Group on

at least six occasions.  Each time the Digatrade Control Group's stock was depleted, Moynes

caused Digatrade to issue new purportedly unrestricted stock in exchange for the settlement of

debt.  Moynes was actively involved in generating the purportedly free-trading shares in the

following ways: (1) As a member of Digatrade's board, he signed board resolutions authorizing

each of the debt conversions; (2) as an authorized signatory on behalf of Digatrade, he signed

debt settlement agreements; and (3) Moynes signed at least one letter on behalf of Digatrade

which was necessary to obtain a legal opinion to have the shares issued without restricted

legends.  In this letter, dated January 22, 2018, Moynes falsely affirmed that a Sharp Group

nominee company was "not an affiliate of the Issuer [Digatrade]…"

58.      During the entire time period, as President, Chief Executive Officer, and Chief

Financial Officer of Digatrade, Moynes signed and certified numerous SEC filings that contained

several misstatements about his ownership of Digatrade shares.  For example, Digatrade's

Annual Report for fiscal year December 31, 2014, filed with the SEC as Form 20-F ("2014

Annual Report"), discusses the company's May 2014 issuance of 28,000,000 common shares but

falsely states that the shares were issued "to arm's length parties who acquired the debts from creditors of the Company." The 2014 Annual Report did not reveal that Moynes retained ownership and control of 21,000,000 of the 28,000,000 newly issued shares and falsely reports the number of shares controlled by Moynes by not including the additional 21,000,000 shares he received. Moynes signed the 2014 Annual Report and certified:

> Based on my knowledge this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

Moynes signed and certified Digatrade's Annual Report for fiscal years December 31, 2015, December 31, 2016, December 31, 2017 and December 31, 2018 which were all filed with the SEC. Each annual report: (1) failed to report the additional number of shares that Moynes received from Digatrade's subsequent issuances of stock; (2) falsely stated that Digatrade's subsequent issuances of stock in exchange for debt were provided to arms-length parties; and (3) contained a statement signed by Moynes certifying the accuracy of the information contained in the annual report.

59.     Moynes profited from his involvement in the Digatrade Control Group. Between November 2016 and February 2018, the Digatrade Control Group sold 24.3 million shares of Digatrade via the Sharp Group and generated proceeds of over $5.3 million.

60.     The Exchange Act requires individuals who acquire more than 5% of the outstanding stock of companies registered under Section 12 of the Exchange Act to file reports with the Commission that disclose their ownership interest. These ownership reports provide important information to investors about what a company's control persons are doing with their stock. Digatrade was a company registered under Section 12. Moynes never reported his

beneficial ownership of the Digatrade shares he held as part of the Digatrade Control Group and never reported his sale of those shares as required under securities laws.

61.     Moynes was formerly an investment adviser and was aware of the securities laws. Moynes knew about and understood, or recklessly disregarded, Section 13(d) of the Exchange Act which required that Moynes disclose his direct or indirect ownership, as part of a group, of more than 5% of Digatrade's outstanding shares.  Moynes (and in later years he together with the Digatrade Control Group) controlled the Sharp Group nominee companies, and, as a result, he was the beneficial owner of more than 5% of Digatrade's publicly traded stock and was required to disclose that interest.

62.     When Moynes and the Digatrade Control Group directly or indirectly sold Digatrade stock, there was no registration statement for those sales on file with the Commission or in effect as to those transactions, as required by Section 5 of the Securities Act.  As part of the Digatrade Control Group, Moynes also failed to comply with the sale limitations of SEC Rule 144 when directly or indirectly selling Digatrade stock.  Those sales were made using the interstate telecommunications facilities of OTC Markets in the United States.

**NET PROFITS AND TRANSFERS TO RELIEF DEFENDANT**

63.     As discussed above, from March 2014 to November 2014, Moynes sold millions of shares of Formcap using the Sharp Group, generating approximately $327,745 in net trading proceeds.  Q accounting records show that after costs, Moynes received approximately $255,900 in net profits derived from his illicit Formcap trading in the form of wire transfers paid to his company, Vancap Ventures.

64.     From May 2015 to February 2018, Moynes (and later as part of the Digatrade Control Group) dumped million shares of Digatrade into the market, generating approximately

$5.9 million in net proceeds.  Q accounting records show that Carrillo received approximately

$2.3 million of the illicit trading proceeds.  Q accounting records also show that the Defendants

received approximately $1.28 million in net profits from their illicit Digatrade trading.

65.     In total, the Defendants received over $1.5 million of illicit trading proceeds

derived from sales of Formcap and Digatrade shares through the Sharp Group.  Moynes directed

funds from the Sharp Group for his personal benefit including by withdrawing approximately

$50,000 in cash from the Sharp Group, and by wiring approximately $510,000 to Digatrade.

Moynes also directed the bulk of his illicit profits derived through the Sharp Group to Vancap

Ventures.  Specifically, from February 2014 through February 2018, Moynes directed Sharp

Group personnel to send 12 wires totaling approximately $980,400 to Vancap Ventures.

Through these transfers, Moynes directed his illicit sale proceeds to his own company for no

legitimate purpose or consideration.

## FIRST CLAIM FOR RELIEF
## FRAUD IN THE OFFER OR SALE OF SECURITIES
### (Violations of Sections 17(a) of the Securities Act by Moynes and Digatrade)

66.     Paragraphs 1 through 65 above are re-alleged and incorporated by reference as if

fully set forth herein.

67.     By reason of the conduct described above, the Defendants, in connection with the

offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or

of the mails, directly or indirectly, acting intentionally, knowingly, recklessly or negligently

(i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means

of any untrue statement of a material fact or any omission to state a material fact necessary in

order to make the statements made, in light of circumstances under which they were made, not

misleading; and (iii) engaged in transactions, practices, or courses of business which operated or

would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

68.     By reason of the conduct described above, Defendants violated Section 17(a) of the Securities Act [15 U.S.C. §77q(a)] and will continue to violate that section unless restrained and enjoined.

**SECOND CLAIM FOR RELIEF**
**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 by Moynes and Digatrade.)**

69.     Paragraphs 1 through 65 above are re-alleged and incorporated by reference as if fully set forth herein.

70.     By reason of the conduct described above, Defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; (ii) made any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made not misleading; and (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

71.     By reason of the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] thereunder.

**THIRD CLAIM FOR RELIEF**
**UNREGISTERED OFFERINGS OF SECURITIES**
**(Violations of Sections 5(a) and 5(c) of the Securities Act by Moynes and Digatrade)**

72.     Paragraphs 1 through 65 above are re-alleged and incorporated by reference as if fully set forth herein.

73.     By reason of the conduct described above, Defendants, directly or indirectly: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities, including, but not limited to, one or more of the securities identified in this Complaint, as to which no registration statement has been filed and for which no exemption from registration has been available.

74.     As a result, Defendants violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§77e(a), (c)].

### FOURTH CLAIM FOR RELIEF
### OTHER EQUITABLE RELIEF, INCLUDING UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST
### (against Vancap Ventures)

75.     Paragraphs 1 through 65 above are re-alleged and incorporated by reference as if fully set forth herein.

76.     Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)] states: "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

77.     Vancap Ventures, the relief defendant, has received investor funds derived from the unlawful acts, practices and scheme of Moynes and Digatrade under circumstances dictating that, in equity and good conscience, it should not be allowed to retain such funds.

78.     Further, specific property acquired or improved by the relief defendant is traceable to Moynes' and Digatrade's wrongful acts, and there is no reason in equity why the relief defendant should be entitled to retain that property.

79.     As a result, the relief defendant is liable for unjust enrichment and should be required to return the ill-gotten gains, in an amount to be determined by the Court.  The Court should also impose a constructive trust on property in the possession of the relief defendant that is traceable to the Defendants' wrongful acts.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a Judgment that:

A.     Permanently restrains and enjoins the Defendants and their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Section 5 of the Securities Act [15 U.S.C. §77e], Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5];

B.     Permanently restrains and enjoins Moynes and his agents, servants, employees and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from directly or indirectly, including but not limited to, through any entity he owns or controls, participating in the issuance, purchase,

offer, or sale of any security; provided, however, that such injunction shall not prevent him from purchasing or selling securities listed on a national securities exchange for his own personal account;

C.     Permanently bars the Defendants from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and/or Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)];

D.     Permanently bars Moynes from serving as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. §77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)];

E.     Orders Defendants to disgorge jointly and severally, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint pursuant to Section 21(d)(7) of the Exchange Act [15 U.S.C. §78u(d)(7)];

F.     Orders Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

G.     Orders Vancap Ventures to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in the Complaint;

H.     Retains jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

I.     Grants such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.


DATED:  June 27, 2022             Respectfully submitted,

                                  _/s/ Jennifer A. Cardello_____
                                  Jennifer A. Cardello (Mass Bar No. 657253)
                                  Kathleen Burdette Shields (Mass Bar No. 637438)
                                  Robert Baker (Mass Bar No. 654023)
                                  SECURITIES AND EXCHANGE COMMISSION
                                  Boston Regional Office
                                  33 Arch St., 24th Floor
                                  Boston, MA 02110
                                  Phone: 617-573-4577 (Cardello), 617-573-8904 (Shields)
                                  Fax: 617-573-4590
                                  cardelloj@sec.gov; shieldska@sec.gov